IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE


Civil Case No. 17-cv-03064-LTB

LATAUSHA MONIQUE HALBEISEN,

        Plaintiff,

v.

ANDREW M. SAUL, Commissioner of Social Security,

        Defendant.

_____

# ORDER

_____


      Plaintiff, Latausha Monique Halbeisen, appeals from the final decision of the

Social Security Administration ("SSA") Commissioner[1] denying her application for

disability insurance benefits, filed pursuant to Title II of the Social Security Act 42

U.S.C. § 401, *et. seq.*, and her application for supplemental security income, filed

pursuant to Title XVI of the Social Security Act 42 U.S.C. § 1381 *et. seq.*

Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral argument would not

materially assist me in the determination of this appeal.  After consideration of the

parties' briefs, as well as the administrative record, I REVERSE the

Commissioner's final order and REMAND for further proceedings consistent with

this opinion.

---

    [1]Andrew Saul is now the Commissioner of Social Security and is automatically
substituted as a party pursuant to Federal Rule of Civil Procedure 25(d). Section 205(g)
of the Social Security Act states that an action survives regardless of any change in the
person occupying the office of Commissioner of Social Security. 42 U.S.C. § 405(g).

# I. STATEMENT OF THE CASE

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for disability insurance benefits and for supplemental security income. After these applications were initially denied on February 21, 2015, on the basis that the record was insufficient to find her disabled [Administrative Record at Doc #11, "AR" 84, 92], an Administrative Law Judge ("ALJ") held an evidentiary hearing on October 14, 2016 [AR 48-75], and thereafter issued a written ruling dated December 5, 2016. [AR 27-42]  The ALJ denied her applications on the basis that Plaintiff was not disabled, from April 16, 2013 through the date of the decision, because Plaintiff could perform work existing in significant numbers in the national economy considering her age, education, work experience and assessed residual functional capacity ("RFC")(Step Five). [AR 42]

The SSA Appeals Council subsequently reviewed additional evidence in the form of a medical source statement provided by Plaintiff dated January 19, 2017 [AR 13-16], but found that it did not "relate to the period at issue." [AR 2]  As such, it denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final. [AR 1-7]  Plaintiff timely filed her complaint with this court seeking review of the Commissioner's decision.

# II. FACTS

Plaintiff was born on April 18, 1988, and has a high school education and some college, and she is able to communicate in English. [AR 41]  Her prior employment includes work as a receptionist, systems operator, systems analyst,

customer service representative/supervisor, and dispatcher. [AR 40, 229] Plaintiff alleges that she became disabled on April 16, 2013 due to a "neck problem," "elbow problem" and "brain injury." [AR 85, 93, 228]

On April 16, 2013, her alleged onset date, Plaintiff was in a motor vehicle accident. Plaintiff reported to her primary care provider – Kaiser Permanente Colorado (Kaiser) – because she was experiencing neck pain and hand pain. [AR 277-92, 441] A cervical spine x-ray showed evidence of muscle spasm, but no acute bony abnormality, and was consistent with a cervical strain. [AR 441] She was diagnosed with neck pain, dorsalgia, and chest wall pain. [AR 441] A few days later, on April 19, 2013, Plaintiff went to the Emergency Room ("ER") at Sky Ridge Medical Center reporting continuing symptoms, including neck pain, and a throbbing right-sided headache with decreased vision. [AR 445-52] A non-contrast CT scan of Plaintiff's brain at that time was normal. [AR 452]

On April 25, 2013, Plaintiff returned to Kaiser reporting a headache with photophobia, and single short episode of horizontal diplopia. [AR 283-84] She returned again to Kaiser on April 29, 2013, reporting headache and concussion. [AR 285] On April 30, 2013, Plaintiff reported to the ER at Sky Ridge Medical Center with neck pain. [AR 454] A CT scan of her cervical spine at that time showed mild straightening, but was negative for cervical radiculopathy, spinal cord compression, fracture or weakness. [AR 455] Examination revealed moderate muscle spasms and moderate soft tissue tenderness. [AR 455]

Plaintiff returned to Kaiser on May 6, 2013, and reported that her neck pain

was intermittent, but her headache symptoms had worsened. [AR 295-96] She again went to the ER at Sky Ridge Medical Center on May 21, 2013 for a migraine headache. [AR 462-71] A follow-up MRI of her brain in June of 2013 was normal, and an MRI of her cervical spine showed a mild disc bulge at level C4-C5. [AR 583-85]

Plaintiff then began seeing Jerry Cupps, D.O., and Wayne Miller, M.D., with Injury Rehabilitation Services. [AR 672-707] On May 10, 2013, Plaintiff reported to Dr. Cupps that as a result of the car accident, she was experiencing dizziness, memory loss, headaches, blurred vision, buzzing in the ears, ears ringing, difficulty sleeping, arm/shoulder pain, neck pain, neck stiffness, jaw pain on the right side, irritability, fatigue, stomach upset, nausea, and mid-back pain. [AR 672-76] Examination revealed pain and spasm in the cervical spine, and upper thoracic areas, dropping down into the low back. [AR 675] Dr. Cupps' range of motion assessment revealed shoulder strain of both shoulders, and mild pain with range of motion testing of the cervical spine, and minimal pain with range of motion testing of the thoracic spine. [AR 676]

Plaintiff visited Dr. Cupps again on May 21, 2013 because she was experiencing temporomandibular joint pain at a rate of 8 out of 10; right temporal area pain at 8 out of 10; right atlanto occipital pain at 8 out of 10; headache at 10 out of 10; as well as dizziness, weakness, low back pain, blurred vision, and pain when she opened her right eye. [AR 677] She was also unable to open her mouth beyond 3 centimeters, and her grip strength was 3 out of 5. [AR 677-78] On Dr.

4

Cupps' recommendation, Plaintiff reported to the ER later that day with a migraine headache reporting pain of 10 out of 10, and blurred vision, photophobia, and severe nausea. [AR 473]

On May 23, 2013, Plaintiff requested that Dr. Cupps fill out a form for her employer. [AR 679]  In his report, Dr. Cupps indicated that "[t]his patient has significant problems with her head/headache, blurred vision, neck pain, muscle spasms and in general, a lack of ability to work" and then excused her from work through June 30, 2013. [AR 679]  He also noted that "[a]s per the patient's employer (Linda B.); if patient should make a dramatic recovery before June 1, with my approval, she can go back to work." [AR 679-80]

On May 28, 2013, Plaintiff reported to Dr. Cupps that she was unable to work with computers because of her eyes. [AR 681]  On examination, Dr. Cupps noted some restriction in Plaintiff's cervical spine range of motion, significant pain and spasms in her trapezius muscles and neck, tingling in both hands, and shoulder pain on range of motion testing.  Plaintiff reported nausea, some dizziness, and a great deal of difficulty sleeping. Dr. Cupps opined that all of Plaintiff's symptoms were the "direct result" of the motor vehicle accident on April 16, 2013. [AR 681-82] An MRI of Plaintiff's head on June 13, 2013 was normal. [AR 585]  An MRI of the brain without contrast on June 26, 2013, revealed no brain abnormalities, and a cervical spine MRI revealed a mild disc bulge at C4-5. [AR 583-84]

On June 14 and July 3, 2013, Plaintiff followed-up with Dr. Miller at Injury Rehabilitation Services, reporting headache and migraine pain, as well as pain and

discomfort in her shoulders, neck, arms, and back. [AR 683-87]  At an appointment on July 10, 2013, Plaintiff discussed her anxiety and fears concerning the auto accident, and Dr. Cupps referred her to a psychologist. [AR 688]  Dr. Cupps also reported the conclusions of Bennett Machanic, M.D., a neurologist, by re-stating his assessment as follows:

> A rather violent motor-vehicle accident of April 16, 2013, currently did result in a closed head injury/trauma and a cerebral concussion. She now has posttraumatic mixed headache syndrome with a chronic daily headache basis pattern. Many of these events are clearly migraine events. Clinically, she has significant cervical strain, upper thoracic strain, bilateral scalenus anticus dysfunction and signs to implicate bilateral upper extremity thoracic outlet syndrome and right carpal tunnel syndrome. [AR 688]

Plaintiff again saw Dr. Miller on August 1, 2013, who referred her for physical therapy for thoracic outlet syndrome, neck pain and back spasms, and continued chiropractic care. [AR 690-91]  Dr. Miller also noted at this visit that Plaintiff was still off work, per her neurologist, and was scheduled to be off work for another three or four weeks. [AR 691]  On August 16, 2013, Plaintiff reported to Dr. Cupps that she was very stressed out over her financial situation, she was "very tearful and concerned," and she reported that she continues to have pain in her head, neck, trapezius muscles, as well as intermittent neuropathy of the arms and hands. [AR 692]  Dr. Cupps referred Plaintiff to a pain management specialist. [AR 693]  He also wrote her a doctor's note stating that "[h]er medical conditions do involve no excessive computer work, critical thinking or physical activities (such as lifting, pushing or pulling)." [AR 692]

On September 4, 2013, Plaintiff reported to Dr. Cupps that her problems had continued or worsened, and she was directed to follow up with Dr. Fuller, a pain management specialist. [AR 694-95]  On October 2, 2013, Plaintiff reported to Dr. Miller neck pain radiating down her back, and headaches, but fewer migraines. [AR 696]  She indicated that she planned to receive pain injections from Dr. Fuller. [AR 697]  On October 23, 2013, Plaintiff reported to Dr. Cupps that she was having a fair amount of pain in her neck and back, and her headaches had worsened. [AR 698]  She also reported anxiety that made her back pain worse and gave her bilateral hand and arm pain and muscle spasms. [AR 698-99]  On November 15, 2013, Dr. Miller reported that Dr. Machanic had performed an EMG study on July 11, 2013, and that Plaintiff was diagnosed with possible brachial plexus stretch injury and possible thoracic outlet syndrome at that time. [AR 700]  Dr. Miller also stated that Dr. Fuller, the pain specialist, wanted to obtain a new EMG of Plaintiff's upper right extremity. [AR 700-01]  On January 8, 2014, Plaintiff reported she was still experiencing back pain, neck pain, headaches, and numbness and tingling in her arms and hands. [AR 702]  On May 8, 2014, Plaintiff was discharged from care with Injury Rehabilitation Services, as Dr. Miller indicated that she "has reached a point where additional care here is unlikely to provide any additional significant relief of her accident-related complaints. She is felt to be at [maximum medical improvement] at this time." [AR 704-706]

On June 4, 2014, Plaintiff saw Jeffrey Kleiner, M.D., at the Spine Center of the Medical Center of Aurora for evaluation of her neck pain and bilateral upper

extremity dyesthesias and weakness. [AR 474]  Plaintiff reported to Dr. Kleiner

that since the accident she had migraine headaches about once a week, and

tension-type headaches about three times a week.  Dr. Kleiner noted that imaging

showed a loss of disc space at C5-6, but no instability and a loss of normal

cervical lordosis. [AR 474-75]  His examination revealed bilateral weakness in her

upper extremities and breakaway weakness in both hands. She also had a positive

straight arm test and reduced cervical spine range of motion.  Dr. Kleiner indicated

that Plaintiff "appears to have symptoms at least in part related to thoracic outlet

syndrome." [AR 475]

On July 28, 2014, Plaintiff visited Kaiser Mental Health and was diagnosed

with post-traumatic stress disorder [PTSD] and chronic recurrent moderate major

depression. [AR 308]  Plaintiff was assigned a Global Assessment of Functioning

[GAF] score of 51. [AR 311]

On July 29, 2014, Plaintiff saw Richard Sanders, M.D., a thoracic outlet

syndrome specialist. [AR 265-69]  Dr. Sanders indicated that Plaintiff suffered from

"fairly severe" bilateral thoracic outlet and pectoralis minor syndrome, with

particularly severe symptoms in the thoracic outlet area.  He also diagnosed her

with cervical spine strain. [AR 269]  On examination, Dr. Sanders recorded missing

grip strength probably due to pain, moderate to severe tenderness in her shoulder

and neck area, positive Tinel's sign, and pain and paresthesia bilaterally in the

arms and shoulders. [AR 267]  She also exhibited reduced range of motion in the

neck with pain and paresthesia. [AR 268]  Dr. Sanders treated Plaintiff with left

8

scalene nerve blocks – with a "fair-to-poor" response – and opined that her failure to respond to conservative treatment over the past 6-7 months made her "a candidate for surgical decompression of the thoracic outlet and pectoralis minor areas." [AR 269]

On October 12, 2014, Plaintiff was involved in another motor vehicle accident, and was treated at the Aurora Medical Center ER. [AR 477-90]  X-rays of her hips, lumbar spine, and cervical spine were normal, revealing no acute abnormalities, and she was treated with pain medications. [AR 479-81]  On November 4, 2014, Plaintiff returned to Kaiser with a migraine and hand pain that prevented her from folding towels at her job. [AR 322-26]

Throughout this time – from July of 2013 through October of 2014 –  Plaintiff attended physical therapy sessions [AR 506-45, 587-670, 314-21], and underwent regular chiropractic treatments with Breanne Hinz, D.C. – from June of 2013 through July of 2014. [AR 546-82]  At a Kaiser visit on March 27, 2015, Plaintiff was diagnosed with pre-diabetes. [AR 342]

On April 12, 2015, Plaintiff underwent a right scalene muscle injection for her thoracic outlet syndrome. [AR 400]  On April 20, 2015, Plaintiff visited Stephen Annest, M.D., pursuant to an out-of-network referral from Kaiser, for bilateral arm pain and swelling. [AR 492-94]  On examination, Dr. Annest recorded: muscular tenderness in Plaintiff's neck, shoulders, and chest wall; no grip strength reading on either the right or the left; positive Tinel's sign on both sides; and pain and numbness with elbow manipulation. [AR 493]  Dr. Annest concluded that Plaintiff

was not a surgical candidate "due to limited [range of motion] and all over pain."

[AR 493]

At a visit to Kaiser on February 18, 2016 for her thoracic outlet syndrome and back pain, Plaintiff reported that she was experiencing "[l]ots of migraines again." [AR 387-89] Plaintiff again went to Kaiser on April 12, 2016 for complaints of neck pain, and a stretching/pulling sensation in both her arms and hands. [AR 398-99] She was given a steroid injection. [AR 403] On July 22, 2016, she was seen at Kaiser for medication management related to her thoracic outlet syndrome. [AR 407-10] Plaintiff continued to attend physical therapy sessions in 2015 and 2016. [AR 336-38, 392-97, 404-06]

On September 7, 2016, Plaintiff visited the vascular therapy clinic at Kaiser regarding her bilateral arm pain. [AR 496-504] Her physician at the clinic, Travis L. Engelbert, M.D., noted a prior electro-diagnostic study that showed significant brachial plexus issues over the right lower plexus, and to a lesser extent over the left lower plexus. Dr. Engelbert referred her for a repeat EMG of her bilateral arms. [AR 497] His examination revealed tenderness, pain radiating down her arms, diminished pulses in her arms, significantly diminished grip strength, and possible mid thenar wasting on the left. [AR 501] Dr. Engelbert indicated that there may be "very limited value" in surgery. [AR 502]

The opinion evidence in the record is limited. On May 23, 2013, Plaintiff asked Dr. Cupps to fill out a Family Medical Leave Documentation Form, which excused Plaintiff from work through June 30, 2013. [AR 679] In so doing, Dr.

Cupps stated that Plaintiff's employer informed him that if Plaintiff "should make a dramatic recovery before June 1, with my approval, she can go back to work." [AR 679-80] And, on August 28, 2014, Dr. Sanders wrote a letter concluding that Plaintiff needed a first rib resection and pectoralis minor tenotomy surgery as a result of her April 16, 2013 auto accident. [AR 269] The record also contains a mental medical source opinion from state agency psychologist MaryAnne Wharry, Psy.D., who reviewed the record and found insufficient evidence of a mental impairment. [AR 89]

Plaintiff testified at the hearing before the ALJ on October 14, 2016. [AR 48-71] Plaintiff first testified as to her employment history before and after her accidents. [AR 53-58] Plaintiff then testified that she was no longer able to work due to her health, including her thoracic outlet syndrome. [AR 58] She reported that she woke up every morning with a headache, and that she had a hard time lifting things, unscrewing jars and opening a soda, and would drop things. [AR 59] Plaintiff also testified as to her current medications (flexeril, a muscle relaxer; percocet or noritriptyline for pain; Aleve for inflammation in her hands and arms; and no medication for depression). [AR 59-60] She further testified that: she was a possible candidate for surgery for her thoracic outlet syndrome; she had been given injections for the thoracic outlet syndrome pain – which provided some relief but only for a very short time; she did physical therapy but left her feeling "beat up and exhausted"; and she had used a TENS unit but it had not helped. [AR 60-61]

Plaintiff stated that cold, stress, reaching overhead, and tying her shoes

exacerbated her pain. [AR 62-63] She indicated that she could sit for an hour before she felt restless or uncomfortable, stand for an hour or so, walk for thirty or forty minutes, and she could lift about five pounds. [AR 63] During Plaintiff's typical day she would usually read or lie down with her dogs, or sit on the porch on a nice day when she did not have a headache. Plaintiff said that she mostly rested, and took between 1 and 3 naps during the day. [AR 64] Plaintiff testified that she had difficulties grooming herself [AR 64-65], and she tried to wash dishes and do laundry, but often got frustrated and stopped, and she did not vacuum or mop. [AR 66] Plaintiff indicated that she sometimes attended religious services, visited friends two or three times a month, went out to eat three or four times a month, and liked to read, but she could no longer exercise or walk her dogs without assistance. [AR 66-67]

Upon questioning from her attorney, Plaintiff testified that: she had constant numbness and tingling in her hands; she had shooting pains in her arm, neck, and chest when she would "simply reach up to scratch [her] nose"; she dropped a plates of food, coffee cups and glasses; and she sometimes needed help cutting up her food. [AR 68] She testified that she had attended a pain clinic and received several kinds of injections for pain, as well as other recommended treatments. [AR 69-70] Plaintiff also testified that she had migraine headaches about two to three times a week that lasted from when she woke up until three or four in the afternoon, or all day if she did not "catch" them in time. [AR 70]

After the ALJ issued her decision on December 5, 2016, Plaintiff submitted a

form entitled Medical Opinion Regarding Ability to Do Work-Related Activities (Physical) from David Mulica M.D., stating that it was his opinion that since her car accident on April 16, 2013, Plaintiff could perform less than a full range of sedentary work. [AR 13-16]

## III. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

The sequential evaluation process used to determine whether a claimant is disabled starts with Step One, which is a determination of whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.

*See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520 (e)&(f), 416.920(e)&(f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV. ALJ's RULING

The ALJ in this case found that Plaintiff had worked since her alleged onset date of April 16, 2013, but that her work did not rise to the level of substantial gainful activity (Step One). [AR 32]  The ALJ further ruled that Plaintiff had the severe impairments of: obesity, bilateral thoracic outlet syndrome, pectoralis minor syndrome, disc bulging at C4-5, migraine headaches, anxiety, depression and post-traumatic stress disorder (Step Two). [AR 32-33]  The ALJ concluded, however, that these impairments did not meet or medically equal a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three). [AR 33]

The ALJ then determined that Plaintiff retained the RFC to perform light work except as follows.  She could only occasionally use hand controls, climb ramps

and stairs, and perform work that requires the use of computer screens, but that she could not reach overhead, climb ladders and scaffolds, kneels, crawl, or work at unprotected heights or dangerous unprotected machinery. In addition, she could frequently reach in all directions (except overhead), handle, finger and feel. And she was limited to simple, routine, and repetitive work. [AR 35-40]

Based on this assessed RFC, the ALJ found that Plaintiff was unable to perform her past relevant work at Step Four. [AR 40] However, the ALJ further found that Plaintiff could perform work existing in significant numbers in the national economy considering her age, education, work experience and assessed RFC (Step Five). [AR 41] Specifically, based on the testimony of the vocational expert, the ALJ found that Plaintiff was able to perform the requirements of representative occupations such as: photocopy machine operator, collator operator, routing clerk, document preparer, addressing clerk, and cutter/paster. [AR 41] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not disabled as defined by the SSA. [AR 42]

## V. STANDARD OF REVIEW

This court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *Williamson v. Barnhart,* 350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001); *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000).

Thus, the function of my review is "to determine whether the findings of fact

. . . are based upon substantial evidence and inferences reasonably drawn therefrom; if they are so supported, they are conclusive upon [this] reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991).

With regard to the application of the law, reversal may be appropriate when the SSA Commissioner either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

## VI.  RFC ASSESSMENT

Plaintiff's primary argument on appeal is that the ALJ erred when assessing her RFC.  Specifically, she argues that:  1) there was insufficient evidence for the ALJ to rule that Plaintiff could reach in all directions (expect overhead), as well as handle, finger, and feel frequently; 2) the assessed RFC failed to include limitations related to Plaintiff's headaches; and 3) the ALJ failed to adequately account for Plaintiff's pain when assessing her RFC.

"In arriving at an RFC, agency rulings require an ALJ to provide a narrative

discussion describing how the evidence supports his [or her] conclusion." *Lawton v. Barnhart*, 2005 WL 281378 (10th Cir. 2005)(unpublished)(citing Social Security Ruling 96–8p). The ALJ must also explain how any material inconsistencies or ambiguities in the record were considered and resolved, and the RFC assessment "must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*; *see also Baysinger v. Astrue*, 2012 WL 1044746 (D. Colo. 2012)(unpublished).

Plaintiff first argues that the ALJ's RFC assignment of her ability to frequently reach in all directions (except overhead), as well as handle, finger, and feel frequently, was not supported by sufficient evidence. Specifically, Plaintiff asserts that the ALJ rejected significant probative evidence of disabling pain and range of motion constraints in her upper extremities, without providing any analysis as to why, in order to conclude that she was not limited in her ability to frequently reach (except overhead), handle, finger and feel.

When determining Plaintiff's RFC, the ALJ found that Plaintiff had alleged several disabling limitations, but that "objective testing, diagnostic testing, and/or radiologic imaging do not support her allegations" and, in addition, that they are "inconsistent with the medical evidence." [AR 36] After reviewing the medical evidence, the ALJ indicated that Plaintiff "experiences some discomfort," but "considering the intensity, persistence, and limiting effects of her symptoms, the [ALJ] finds that [Plaintiff's] allegations of limitations that preclude all work are

inconsistent with the medical record as a whole." [AR 39]  The ALJ relied on evidence that Plaintiff was able to work part time at a fitness center during the relevant time period, and the fact that she continued to try and find employment. [AR 39]  The ALJ also noted that Plaintiff made inconsistent statements in that she testified that she had not been evaluated for anti-depression medicines when, in fact, she declined such medication during an office visit with Kaiser on November 14, 2014; but the ALJ acknowledged that this single inconsistency "may not be the result of a conscious intent to misled" but "suggest[s] that the information she provided generally may not be reliable." [AR 39]

While these observations may provide some reason to question Plaintiff's reliability in describing her restrictions, they do not undermine the significant medical record evidence supporting Plaintiff's reported reaching limitations and upper body pain.  The medical records indicate that following her accident in April of 2013, Plaintiff consistently reported back and neck pain to her physicians and specialists at Kaiser and Injury Rehabilitation Services, and that examinations and diagnosis supported her complaints.  For example, examination in late May of 2013 revealed restriction in her cervical spine range of motion, significant pain and spasms in her trapezius muscles and neck, as well as tingling in both hands, and shoulder pain on range of motion testing. [AR 681]  In July of 2013, a neurologist report indicated Plaintiff has "significant cervical strain, upper thoracic strain, bilateral scalenus anticus dysfunction and signs to implicate bilateral upper extremity thoracic outlet syndrome and right carpal tunnel syndrome." [AR 688]

An evaluation for neck pain and bilateral upper extremity dyesthesias and weakness in June of 2014 by Dr. Kleiner revealed bilateral weakness in Plaintiff's upper extremities and breakaway weakness in both hands, and a positive straight arm test and reduced cervical spine range of motion, resulting in a diagnosis of thoracic outlet syndrome symptoms. [AR 473-75]  Thoraric outlet syndrome "is a group of disorders that occur when blood vessels or nerves in the space between your collarbone and your first rib (thoracic outlet) are compressed.  This can cause pain in your shoulders and neck and numbness in your fingers." [Doc #17 FN 3]

Dr. Sanders' examination revealed: missing grip strength probably due to pain; moderate to severe tenderness in her shoulder and neck area; positive Tinel's sign; and pain and paresthesia bilaterally in the arms and shoulders, as well as reduced range of motion in the neck with pain and paresthesia. [AR 267-68]  He diagnosed Plaintiff with "fairly severe bilateral thoracic outlet and pectoralis minor syndrome," as well as cervical spine strain in July of 2014. [AR 269]

Dr. Annest's examination in April of 2015 for bilateral arm pain and swelling revealed muscular tenderness in Plaintiff's neck, shoulders, and chest wall; no grip strength reading on either the right or the left; positive Tinel's sign on both sides; and pain and numbness with elbow manipulation. [AR 493]  In September of 2016, Dr. Englebert evaluated Plaintiff's bilateral arm pain, and his examination revealed tenderness, pain radiating down her arms, diminished pulses in her arms, significantly diminished grip strength, and possible mid thenar wasting on the left. [AR 496-504]

Based on this record – which shows Plaintiff's consistent reporting of increasing neck and shoulder pain, in conjunction with numbness and swelling in her arms and increased inability to grip, as well as confirming examination findings and diagnoses that relate to her limited upper body mobility – the ALJ's determination that Plaintiff's only reaching limitation was overhead and that she was frequently able to handle, finger, and feel, is not supported by the medical evidence in the record. As such, the ALJ's failure to address the significant evidence that supports Plaintiff's testimony related to her upper body limitations constitutes error. *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)(ruling that "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects"); *see also Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001)(noting that "[a]lthough the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is significantly probative").

On remand, the ALJ is directed to re-assess Plaintiff's RFC by addressing the medical evidence in the record that supports Plaintiff's claim of restrictions based on her upper body limitations. In so doing, the ALJ should also specifically address the effects of Plaintiff's headaches – which are well documented in the medical records – on her ability to work. *Lauer v. Commissioner, SSA*, 752 F. App'x 665, 667 (10th Cir. 2018)(unpublished)(remanding for further evaluation of the plaintiff's complaint of migraine headaches, evidenced in the record, as "the effect of these

symptoms may not have been accounted for in the ALJ's RFC assessment"). In addition, the ALJ is directed to reassess Plaintiff's objective and subjective complaints of pain. *See Marr v. Colvin*, 67 F. Supp. 3d 1267, 1271 (D. Colo. 2014)(ruling that when the record contains some objective evidence of an impairment capable of producing the type of pain of which plaintiff complained, "the ALJ was required to consider whether these impairments were in fact disabling based on all the evidence of record, both objective and subjective")(citing *Musgrave v. Sullivan*, *supra*, 966 F.2d at 1375-76).

It is not clear that reassessment will necessarily change the ALJ's conclusion that benefits should be denied, and thus the decision of the Commissioner will be reversed and remanded for further findings. *See Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006).

## VII. OPINION EVIDENCE

I also address Plaintiff's contention that ALJ failed to adequately analyze the opinion of Dr. Cupps related to her ability to work. The records reveal that Dr. Cupps initially examined Plaintiff on May 10, 2013, and then saw her again on May 21, 2013. A few days later, on May 23, 2013, Plaintiff asked Dr. Cupps to fill out a Family Medical Leave form so that she would not lose her job. [AR 679] In his report related to this request, Dr. Cupps indicated that "[t]his patient has significant problems with her head/headache, blurred vision, neck pain, muscle spasms and in general, a lack of ability to work." [AR 679] The report further indicated that after gathering information by speaking to Plaintiff and her

employer, Dr. Cupps filled out the form excusing her from work through June 30, 2013. [AR 679]  He also noted that "[a]s per the patient's employer (Linda B.); if patient should make a dramatic recovery before June 1, with my approval, she can go back to work." [AR 679-80]  Relying on this, the ALJ found that is was Dr. Cupps' opinion that Plaintiff had "difficulty with activities of daily living and cannot work," and, although he excused her from work through June 30, 2013, he noted that if she "should make a dramatic recovery before June 1, she could return to work with his approval." [AR 39]  The ALJ also found that Dr. Cupps did not preclude Plaintiff from all work activity, and "[h]e also stated that she could eventually return to work." [AR 39]  The ALJ indicated that she gave Dr. Cupps' opinion great weight because it "is consistent with the medical evidence that shows that [Plaintiff] is currently capable of work." [AR 39]

Plaintiff contends that the ALJ's interpretation of Dr. Cupps' opinion of her ability to work is erroneous in that he was not opining that she could work or return to work in the future, but merely that she could not work at that time.  The Commissioner does not dispute this, but instead argues that the record contains other evidence to support an interpretation that Dr. Cupps believed that Plaintiff's inability to work was temporary; specifically, the fact that Dr. Cupps wrote her a doctor's note "for her job seeking help" on August 16, 2013, that stated:

> She is actively seeking full-time employment. Her medical conditions do involve no excessive computer work, critical thinking or physical activities (such as lifting, pushing or pulling). [AR 692]

On remand, I direct the ALJ to clarify her interpretation of Dr. Cupps'

opinion related to Plaintiff's limitations and her ability to work, as well as the basis in the records for that interpretation, and the weight the ALJ gives to that opinion. In addition, I direct the ALJ to review and determine the applicability of the additional medical opinion evidence submitted by Plaintiff to the Appeals Council, after the ALJ's initial decision, from David Mulica M.D. [AR 13-16]

ACCORDINGLY, for the foregoing reasons, I REVERSE and REMAND the Commissioner's final order with directions for reconsideration as set forth above.

Dated:  September 17, 2019 in Denver, Colorado.

BY THE COURT:

   s/Lewis T. Babcock     
LEWIS T. BABCOCK, JUDGE